

FILED

Apr 18 2018, 10:44 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Valerie K. Boots
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Supervising Deputy Attorney
General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Daniel Sparks,<br><br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br><br>*Appellee-Plaintiff* | April 18, 2018<br><br>Court of Appeals Case No.<br>49A05-1710-CR-2218<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Amy J. Barbar,<br>Magistrate<br><br>Trial Court Cause No.<br>49G02-1604-F4-15494 |

**Vaidik, Chief Judge.**

## Case Summary

[1]     Lindsey Badanek's home was burglarized while she was at work and, among

other things, her employer-issued iPad was taken.  She suspected that her ex-

boyfriend, Daniel Sparks, had something to do with it. She called the police, but no further action was taken at the time. Later that night, Lindsey logged into Sparks's Facebook account using a password that he had previously given her. She found an audio recording where Sparks was discussing an iPad owned by Eli Lilly that was going to get "pinged," yelling at a woman for her husband "veering" off the list, and threatening to "bang[] him on top" for doing so. Lindsey called the police again, and a video was made of her playing the recording from Sparks's Facebook account. A search warrant was issued, and the iPad was found at Sparks's home. Sparks was convicted of burglary, and he now appeals, arguing that the federal Wiretap Act was violated.

[2] Federal courts have uniformly concluded that the Wiretap Act covers only "contemporaneous" interceptions of wire, electronic, or oral communications, which are understood as the acquisition of communications in transit—rather than the acquisition of communications in storage. Here, it is undisputed that Lindsey discovered on Sparks's Facebook account a recording of a conversation that had already taken place. Finding no violation of the federal Wiretap Act or error in any of the other issues that Sparks raises, we affirm the trial court.

# Facts and Procedural History

[3] Lindsey and Sparks started dating in 2012 and had three children together. They lived on Depot Drive in Indianapolis. In March 2016, Lindsey asked Sparks to move out of the house. She and the children stayed in the house.

[4] On April 20, Lindsey, who worked at a credit union inside Lilly Corporate Center, returned home from work around 5:30 p.m. Upon returning home, she noticed that her employer-issued iPad was not where she had left it that morning. When Lindsey went to her bedroom to look for it, she discovered that additional items were missing: her collection of Nike Air Max shoes, a laptop, a hard drive containing family pictures, a ring, and a North Face jacket. Lindsey thought it was "odd" that the items missing were "personal" to her. Tr. Vol. II p. 96. Lindsey noted that other electronics were not taken from her house, including another tablet that was right next to her iPad, televisions, and her daughter's hoverboard. Lindsey immediately suspected that Sparks "had something to do with it" and called 911. *Id.* at 97. Indianapolis Metropolitan Police Department Officer Michael Hodge responded. Lindsey told Officer Hodge that she suspected Sparks was involved. Officer Hodge made a report.

[5] Later that night, Lindsey logged into Sparks's Facebook account using a password that he had previously given her. She wanted to see if Sparks was "talking about breaking into [her] house." *Id.* at 100. Lindsey found an audio recording in his Facebook messages. *See* Ex. 2. Lindsey recognized Sparks's voice on the recording. Sparks was angrily yelling at a woman about her "husband":

> Let me tell you something about that iPad. When you turn that bit** on, Eli Lilly owns that iPad. That iPad is going to get pinged off. Guess who is going to get popped with it. I told that stupid mother fu**er . . . not to veer off the goddamn list. I told him if he veered off the list, he's going to get fu**ed up. When I catch your husband, I'm banging him on top for disrespecting me

and for going against what the fu** I told him. . . . [G]o find him and tell him how serious this mother fu**ing situation is.

*Id.* Lindsey called the police again, and two officers responded, Officer Erik Stevenson and Sergeant Charles Wheeler. Lindsey played the recording for them. A video was then made of Lindsey playing the recording from Sparks's Facebook account. Lindsey looked "further into [Sparks's] Facebook account" and found a "message"[1] from Sparks to William Bingaman sent "right after that recording" indicating that Sparks was angry with Bingaman. Tr. Vol. II p. 103. Lindsey gave this information to Sergeant Wheeler. Also, Sergeant Wheeler learned that Sparks was on GPS monitoring through Marion County Community Corrections and was home when Lindsey's house was burglarized.

[6] Sergeant Wheeler prepared an affidavit in order to seek a search warrant for Sparks's home, and a magistrate issued a search warrant in the early-morning hours of April 21. *See* Suppression Ex. 2. During the execution of the search warrant, police found an iPad, which was later determined to be Lindsey's employer-issued iPad.

[7] The State charged Sparks with Class A misdemeanor theft and Level 4 felony burglary. Before trial, Sparks filed a motion to suppress the video of Lindsey playing the recording from Sparks's Facebook account and the iPad found in his home. After a hearing, the trial court denied Sparks's motion. A jury trial

---

[1] There is no evidence as to what type of message this was. *See* Tr. Vol. II p. 103.

was then held.  At trial, Bingaman testified that he broke into Lindsey's house and took the items at Sparks's direction.[2]  Sparks told Bingaman to take Lindsey's shoes and clothing but not to take anything that belonged to the children.  Sparks said that he wanted to get back at Lindsey because she had kicked him out and thrown away his things.  Bingaman agreed to help Sparks because he needed money to buy drugs.  According to Bingaman, he gave the iPad to Sparks and sold the other items.  The jury found Sparks guilty as charged.  The trial court entered judgment of conviction for burglary only and sentenced him to six years with two years suspended.

[8]  Sparks now appeals.

# Discussion and Decision

## I. Facebook Recording

[9]  Sparks first contends that the trial court erred in admitting Exhibit 2—the video of Lindsey playing the recording from Sparks's Facebook account.  Sparks argues that "[Lindsey] and/or the police" violated the federal Wiretap Act, 18 U.S.C. § 2511, and the Indiana Wiretap Act, Ind. Code art. 35-33.5, "by intercepting part of a telephone call made by Sparks without authorization." Appellant's Br. p. 13.  But Sparks did not make claims under these statutes in the trial court.  Rather, in his motion to suppress, in his supporting brief, and at

---

[2] Bingaman pled guilty to Level 4 felony burglary for his role in this crime.  Ex. 9.

the hearing, Sparks claimed only that his rights pursuant to the Fourth Amendment of the United States Constitution and Article 1, Section 11 of the Indiana Constitution were violated because Lindsey was a "government actor." *See* Appellant's App. Vol. II pp. 91, 95-100; Tr. Vol. II p. 5. Objecting at trial on one ground and raising another ground on appeal usually results in waiver of the issue. *See Houser v. State*, 823 N.E.2d 693, 698 (Ind. 2005). Here, however, the State points out waiver only with regard to Sparks's claim under the Indiana Wiretap Act.[3] Therefore, we will address Sparks's challenge to Exhibit 2 under the federal Wiretap Act.

[10] The federal Wiretap Act makes it unlawful to "intentionally intercept[], endeavor[] to intercept, or procure[] any other person to intercept or endeavor to intercept[] any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The federal Wiretap Act also prohibits the intentional "disclos[ure]" or "use[]" of the contents of an unlawfully intercepted wire, oral, or electronic communication. *Id*. § 2511(1)(c), (d). "[I]ntercept" is defined as "the aural or other acquisition of the contents of any wire, electronic, or oral communication." *Id*. § 2510(4). "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no

---

[3] Sparks asserts that he preserved his claim under the Indiana Wiretap Act because he cited *Henson v. State,* 790 N.E.2d 524 (Ind. Ct. App. 2003), *trans. denied*, in his supporting brief. *Henson*, however, focuses on the federal Wiretap Act and mentions the Indiana Wiretap Act only in passing. Simply citing this decision without also discussing, or even citing, the statute itself was not sufficient to preserve this claim.

evidence derived therefrom may be received in evidence in any trial . . . ." *Id.* § 2515.[4]

[11] The State argues that the federal Wiretap Act does not apply here. It asserts that the Act only applies to "contemporaneous" interceptions of communications and highlights that here, Lindsey discovered on Sparks's Facebook page a recording of a conversation that had already taken place. The federal Wiretap Act does not explicitly require that the acquisition of a communication occur contemporaneously with its transmission. 2 Wayne R. LaFave et al., *Criminal Procedure*, § 4.6(b) (4th ed. 2017). Nonetheless, federal courts have uniformly concluded that the Wiretap Act covers only "contemporaneous" interceptions of communications, which are understood as the acquisition of communications in transit—rather than the acquisition of communications in storage, which are addressed by the Stored Communications Act.[5] *See Epstein v. Epstein*, 843 F.3d 1147, 1149-50 (7th Cir. 2016) (collecting cases but not reaching issue), *reh'g denied*, *cert. denied*; *Luis v. Zang*, 833 F.3d 619, 628 (6th Cir. 2016) ("All of the circuit courts that have considered the issue . . . have concluded . . . that the acquisition of a communication must be contemporaneous with its transmission in order for an 'intercept' to occur."), *reh'g denied*; *Theofel v. Farey-Jones*, 359 F.3d 1066, 1077-78

---

[4] The exclusionary rule does not apply to "electronic communications." *See, e.g.*, *United States v. Steiger*, 318 F.3d 1039, 1050 (11th Cir. 2003).

[5] Sparks makes no argument under the Stored Communications Act. *See* 18 U.S.C. § 2701.

(9th Cir. 2004) ("[T]he Act applies only to acquisition contemporaneous with transmission." (quotation omitted)); *Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 113-14 (3d Cir. 2003) (adopting "the reasoning of our sister circuits" who have held that interception can only occur contemporaneously with transmission); *United States v. Steiger*, 318 F.3d 1039, 1048-49 (11th Cir. 2003) ("[A] contemporaneous interception—i.e., an acquisition during 'flight'—is required to implicate the Wiretap Act with respect to electronic communications."); *see also* LaFave, § 4(b) (explaining that courts have concluded that the acquisition of a communication must be contemporaneous with its transmission).

[12] Notably, Sparks does not dispute this line of authority. The evidence shows that Lindsey discovered on Sparks's Facebook account a recording of a conversation that had already taken place. Lindsey did not intercept a communication in transit; rather, she accessed a communication in storage. Accordingly, there is no violation of the federal Wiretap Act. We therefore affirm the trial court's admission of Exhibit 2.

# II. iPad

[13] Sparks next contends that the trial court erred in admitting the iPad found during the search of his home because the search warrant was not supported by probable cause. The State argues that Sparks has waived this issue for review because defense counsel did not object when the State introduced the iPad into evidence at trial. *See* Tr. Vol. II pp. 118-23. Sparks acknowledges that defense

counsel did not object at trial; however, he claims that the trial court was nevertheless aware of this issue because he filed a pretrial motion to suppress the iPad. *See* Appellant's App. Vol. II p. 91. The failure to make a contemporaneous objection to the admission of evidence at trial results in waiver of the error on appeal. *Jackson v. State*, 735 N.E.2d 1146, 1152 (Ind. 2000). This is because a contemporaneous objection affords the trial court the opportunity to make a final ruling on the matter in the context in which the evidence is introduced. *Id.* Sparks's failure here results in waiver of appellate review.

[14] Waiver notwithstanding, we address Sparks's claim. In deciding whether to issue a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). As a reviewing court, our duty is simply to ensure that there was a substantial basis for finding probable cause. *Watkins v. State*, 85 N.E.3d 597, 603 (Ind. 2017). We owe great deference to the initial probable-cause determination and will not invalidate warrants by interpreting probable-cause affidavits "in a hypertechnical, rather than a commonsense, manner." *Id.* (quotation omitted).

[15] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article 1, Section 11 of the Indiana Constitution contains nearly identical language. These constitutional principles are codified in Indiana Code section 35-33-5-2, which details the information to be contained in an affidavit for a search warrant. *State v. Spillers,* 847 N.E.2d 949, 953 (Ind. 2006). Where a warrant is sought based on hearsay information, the affidavit must either:

> (1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or

> (2) contain information that establishes that the totality of the circumstances corroborates the hearsay.

Ind. Code § 35-33-5-2(b).

[16] The trustworthiness of hearsay for the purpose of proving probable cause can be established in a number of ways, including where: (1) the informant has given correct information in the past, (2) independent police investigation corroborates the informant's statements, (3) some basis for the informant's knowledge is demonstrated, or (4) the informant predicts conduct or activity by the suspect that is not ordinarily easily predicted. *Spillers,* 847 N.E.2d at 954. These examples, however, are not exclusive.

[17]     Our courts have observed that there are two categories of informants: professional informants and cooperative citizens. *Clifford v. State*, 474 N.E.2d 963, 969 (Ind. 1985). The test for determining the reliability of each group of informant is different. *Id.* Cooperative citizens who act as informants

> include[] victims of crime or persons who personally witness a crime. These individuals generally come forward with information out of the spirit of good citizenship and the desire to assist law enforcement officials in solving crime. They are usually one-time informants and no basis exists from prior dealings to determine their reliability. Further, information of this type usually goes to past completed crimes rather than future or continuing crimes. Some jurisdictions have therefore held that informants of this type are to be considered reliable for the purpose of determining probable cause unless incriminating circumstances exist which cast suspicion upon the informant's reliability.

*Richard v. State*, 820 N.E.2d 749, 754 (Ind. Ct. App. 2005) (quoting *Pawloski v. State*, 269 Ind. 350, 380 N.E.2d 1230, 1232-33 (1978)), *trans. denied*; *see also Allen v. State*, 798 N.E.2d 490, 496 (Ind. Ct. App. 2003) ("[O]ur supreme court has previously held that eyewitnesses and crime victims are considered presumptively reliable unless circumstances exist which call into question their credibility."); *Frasier v. State*, 794 N.E.2d 449, 457 (Ind. Ct. App. 2003) ("Information gleaned from . . . eyewitnesses or victims of a crime may be relied upon in determining whether probable cause exists for a search where there are no circumstances which call the informant's motives into question."), *reh'g denied*, *trans. denied*. But the requirement for corroboration is not totally eliminated. *Richard*, 820 N.E.2d at 754.

[18]     Here, Sergeant Wheeler set forth in the affidavit that Lindsey reported that her house had been burglarized while she was at work and that several items were missing, including her employer-issued iPad. Lindsey suspected that her ex-boyfriend, Sparks, "had someone take the items," but she didn't know who. Suppression Ex. 2. Lindsey said that Sparks had told her that he was "going to have someone come over and take her stuff." *Id.* Because Lindsey was a crime victim, she was presumptively reliable. Accordingly, her statements could be used to determine that probable cause existed to search Sparks's home. Moreover, her hearsay statements were corroborated by the recording she discovered on Sparks's Facebook account.

[19]     Sparks argues, however, that the affidavit contains inaccuracies and omits a detail about the recording and therefore the information about the recording cannot be used to corroborate Lindsey's hearsay statements.[6] We reject this argument. As for the alleged inaccuracies, Sparks points to the following portions of the affidavit:

> On April 21, 2016 at 12:27 AM, Officer Erik Stevenson was dispatched to [XXXX] Depot Dr. to speak with Lindsey Badan[e]k about the recent burglary to her residence. . . . Officer Stevenson listened to the recording and heard a male[']s voice that Lindsey stated was Daniel Sparks, yelling at a female that he was going to "fu** him up for deviating from the list **he gave**

---

[6] On appeal, Sparks admits that it is his voice on the recording. *See, e.g.*, Appellant's Br. p. 13 ("a telephone call made by Daniel Sparks").

**him**"[7] **meaning the guy he had break in Lindsey[']s h[ouse]** . . .
.

> I, Sgt. Charles Wheeler, . . . arrived at the Depot Dr. address and
> also spoke to [Lindsey] and she played an audio recording the
> voice of which she stated she knew was her ex-boyfriend and
> father of her children, Daniel Sparks. **She stated she found the**
> **recording on Facebook and on it Daniel Sparks is heard**
> **speaking to a female, saying he was trying to find William**
> **Bingam[a]n** because Bingam[a]n stole things out of [Lindsey's]
> house that weren't on his list. He specifically states that
> Bingam[a]n "veered from the list" and took an [i]Pad that
> belongs to Eli Lilly, [Lindsey's] employer, and that if turned on it
> could be "pinged" and **he would be caught**.

Suppression Ex. 2 (emphases added). Sparks identifies the following alleged
inaccuracies: (1) the affidavit says that the recording refers to William
Bingaman by name when in actuality the recording only refers to him as the
woman's "husband"; (2) the affidavit says that Sparks "gave" Bingaman the
list, but the recording does not explicitly say that Sparks was the source of the
list; (3) the affidavit says that Sparks had Bingaman break into Lindsey's house,
but the recording does not explicitly say that Sparks was responsible for
Bingaman for breaking in; and (4) the affidavit says that Sparks would be the
one caught if the iPad was turned on and pinged, but the recording more
generally says "Guess who is going to get popped with it." As for (1), contrary

---

[7] The quote marks imply that the statements are verbatim quotes from the recording, but they do not appear
to be verbatim quotes.

to Sparks's suggestion, the affidavit does not say that the recording mentions Bingaman by name. Rather, it says that **Lindsey** told Sergeant Wheeler that the man her ex-boyfriend is talking about on the recording is Bingaman. As for (2)-(4), we find that they are reasonable inferences given the recording as a whole, including the angry and threatening tone of Sparks's voice.

[20] As for the omission, Sparks notes that Sergeant Wheeler did not include the fact that Lindsey discovered the recording by logging into Sparks's Facebook account using his password and argues that had the magistrate known this, it would have impacted his decision to issue the search warrant. He argues:

> Judges and magistrates are all too familiar with vengeful and underhanded tactics in the realm of feuding exes, particularly where the couple have children together. Any such tactics are highly relevant to credibility determinations. Especially where a person's accusations against a former domestic partner are essentially uncorroborated hearsay, a magistrate must be accurately apprised of all relevant facts surrounding the accusations in order to make a fair and informed decision about probable cause for the warrant.

Appellant's Reply Br. pp. 14-15. Given the high level of corroboration provided by the recording, we have serious doubts that the fact that Lindsey discovered the recording by logging into Sparks's Facebook account using a password that he had previously given her would have changed the magistrate's decision to issue the search warrant.

[21] Finally, Sparks argues that there was no reasonable nexus between the information in the affidavit and the location to be searched, i.e., his home. He

highlights that, as even the affidavit provides, he was home when the burglary was committed. However, according to the affidavit, Lindsey, from the very beginning, suspected that Sparks "had someone take the items," but she didn't know who. Suppression Ex. 2. Lindsey also said that Sparks had told her that he was "going to have someone come over and take her stuff." *Id.* Lindsey later discovered the recording. In the recording, Sparks said:

> Let me tell you something about that iPad. When you turn that bit** on, Eli Lilly owns that iPad. That iPad is going to get pinged off. Guess who is going to get popped with it. I told that stupid mother fu**er . . . not to veer off the goddamn list. I told him if he veered off the list, he's going to get fu**ed up. When I catch your husband, I'm banging him on top for disrespecting me and for going against what the fu** I told him. . . . [G]o find him and tell him how serious this mother fu**ing situation is.

Taken in context, there was a substantial basis that the iPad would be found at Sparks's home. Given Sparks's anger at the woman's husband for "veer[ing]" off the list, it was reasonable to presume that Sparks was worried about being caught with the iPad. *See* Appellant's Br. p. 29 (Sparks conceding that it was either he or the unnamed "husband" who was going to get "popped").

[22] In conclusion, the search warrant was based on a practical, commonsense decision that there was a fair probability that contraband or evidence of a crime would be found in Sparks's home. Because the warrant was supported by probable cause, the trial court did not err in admitting the iPad into evidence. We therefore affirm the trial court.

Barnes, J., and Pyle, J. concur.